IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TOUA THAO,

                Plaintiff,

      v.

BOARD OF REGENTS OF THE UNIVERSITY OF
WISCONSIN SYSTEM and UNIVERSITY OF
WISCONSIN SUPERIOR,

                Defendants.

OPINION AND ORDER

17-cv-733-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiff Toua Thao contends that he was terminated by defendant University of Wisconsin Superior because of his race (Asian), national origin (Hmong) and his filing of a complaint of employment discrimination against the university, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. Before the court is defendants' motion for summary judgment. Dkt. #14. Because I conclude that plaintiff has failed to present evidence from which a reasonable jury could conclude that he was terminated because of his race, national origin or protected conduct, I am granting defendants' motion for summary judgment.

      Turning to the parties' proposed findings of fact, I note that in his initial response to defendants' motion for summary judgment, plaintiff filed a confusing 52-page document that appeared to be a combined response to defendants' proposed findings of fact and his own supplemental proposed findings of fact, in violation of this court's summary judgment procedures. Pretrial Conference Order, dkt. #11, at 15 (requiring separate response to

1

moving party's proposed findings of fact and specific format for supplemental proposed findings of fact). I gave plaintiff until September 20, 2018 to submit a response to defendants' proposed findings of fact and his own separate supplemental proposed findings of fact that complied with this court's procedures. Although plaintiff filed a response to defendants' proposed findings of fact, he did not file revised supplemental proposed findings of fact. Therefore, I have considered only defendants' proposed findings of fact and plaintiff's responses to them, to the extent that plaintiff's responses are supported by admissible evidence. Id. at 14 ("Each factual proposition must be followed by a reference to evidence supporting the proposed fact. The citation must make it clear where in the record the evidence is located."). In accordance with this court's procedures, I have not considered any new or supplemental facts that plaintiff proposes in response to defendants' proposed findings of fact. Additionally, I have not considered any facts that plaintiff discussed in his brief but did not set out properly as proposed findings.

From defendants' proposed findings of fact and plaintiff's responses, I find the following facts to be material and undisputed unless otherwise noted.

UNDISPUTED FACTS

A. The Parties and Key Players

Plaintiff Toua Thao was hired on November 18, 2014 as the Assistant Director of Educational Support Services, Director of Student Support Services and Disability Support Services and Americans with Disabilities Act Officer for defendant University of

2

Wisconsin–Superior, which is located in Superior, Wisconsin and is one of 13 four-year public institutions in the University of Wisconsin System. (In December 2016, Educational Support Services was renamed the Educational Success Center.) In his various roles, plaintiff supervised employees who provided a number of services for students, including a bridge program for entering first-year students, developmental education and instruction, disability support, federally-funded student support services, testing services, student advising and tutoring. He also performed budgeting and writing and managed federal grants for the student support services program.

In October 2014, just before plaintiff was hired, the university restructured several areas and the position of Assistant Director of Educational Support Services was changed to report to the Director of Advising and the TRIO manager. (Defendants say that "TRIO" grants are federal grants awarded to the university's Student Support Services. Dkt. #21 at 4-5.) Cortney Alexander was hired as the Director of the Center for Academic Advising and Career Services in June 2015, and her job title was revised in November 2016 to reflect that she was the Director of the Educational Success Center as well. (There is some dispute as to whether Alexander was responsible for supervising plaintiff in Educational Support Services when she was first hired. Defendants say that Alexander's June 2015 position description includes the supervision of duties related to educational support services, but that fact is not obvious from a review of the document. Plaintiff contends that Alexander was not responsible for supervising him until her job title and position description were changed in November 2016, but the only evidence he presents in support of his contention are emails

and articles that refer to Alexander's old job title.) Plaintiff's other supervisor was the TRIO manager, Angie Hugdahl.

Plaintiff also worked with the following individuals at the university at various times: Dr. Christopher Tremblay, Alexander's supervisor and the Vice Chancellor for Enrollment Management from May 2016 to March 2017; Dr. Brenda Harms, who was a professional human resources consultant from May 2015 to May 2016 and has been the Vice Chancellor of the Office of Enrollment Management since March 6, 2017; Steven Marshall, who has been the Interim Director of Human Resources since April 1, 2016; and Erika Bjerketvedt-Field, who was a human resources manager from February 26, 2013 to June 4, 2018.

### B. Plaintiff's Performance

Plaintiff reported to Hugdahl in TRIO with respect to grant management, budgeting and writing for Student Support Services. At some time in either 2015 or 2016 (as discussed above, the parties dispute the exact date), plaintiff also began reporting to Alexander with respect to his role in Disability Support Services and Americans with Disabilities Act compliance, including his management and supervision of staff, community involvement and other responsibilities under the Educational Support Services umbrella. In February 2016, Hugdahl and Alexander gave plaintiff a "satisfactory" performance review for his work between November 2014 and December 2015. Hugdahl's portion of the performance review specifically noted that supervision was the toughest part of plaintiff's job and that plaintiff

should attend supervisor training and avoid developing close personal relationships with his employees. Alexander noted that she intended to have weekly meetings with plaintiff to monitor his progress and she told him to ask for assistance if he was unsure about something, especially human resource issues.

In early 2016, Tremblay identified Educational Support Services as a critical campus service and asked Alexander to provide him more detail on its management. As a result, Alexander monitored plaintiff's management of these services more closely. In March 2016, Alexander began having weekly meetings with plaintiff for which she prepared agendas to direct the discussions. Alexander also recommended that plaintiff attend training focused on management and leadership to better supervise his employees. On April 7, 2016, she and plaintiff both attended the Fred Pryor Seminar "Crash Course for the First Time Manager or Supervisor." Alexander also attended other seminars to work on management skills, including "How to Manage and Resolve Workplace Conflict" and "Building Effective Teams."

Conflicts developed between plaintiff and Alexander. (The parties dispute what happened. Defendants say that plaintiff resisted Alexander's supervision and refused to complete tasks she assigned him and in the manner she requested. Plaintiff says that Alexander lacked an understanding of his program and refused to consider his explanation for performance matters that she criticized.) Alexander specifically noted the following deficiencies in plaintiff's work performance:

- In February 2016, plaintiff allegedly changed the "early alert" program without consulting Alexander, and the changes negatively affected faculty and advisors and drew criticism from the provost. (Plaintiff denies completely changing the program without Alexander's knowledge but does

5

not dispute that changes occurred and that others complained about the changes.)

- Plaintiff allegedly failed to note his vacation requests and travel days in Alexander's calendar and call her before 7:45 a.m. when he was going to be out sick. (Plaintiff says that he did submit his time-off requests properly but they were deleted from Alexander's calendar.)

- On occasion, plaintiff did not attend scheduled meetings with Alexander without offering an explanation or apology. (Plaintiff says that he always notified Alexander in advance of missing a meeting but he does not say that he offered an explanation or apology.)

- Plaintiff created many documents, including published materials, with misinformation and typographical errors. (Plaintiff does not deny this but says that Alexander made similar errors in her emails.)

### C. Plaintiff Complains of Discrimination

In early October 2016, plaintiff asked Tremblay for clarification regarding his and Alexander's roles and responsibilities, stating that their position descriptions were misleading. On October 18, 2016, plaintiff, Alexander and Tremblay met to discuss issues surrounding the changes to the Educational Success Center. Tremblay then set another meeting to discuss what roles, responsibilities and duties would be performed by the director and assistant director and required both Alexander and plaintiff to submit written comments before the meeting.

Also on October 18, plaintiff told Marshall (in human resources) that he believed Alexander was discriminating against him by asking for full access to his calendar. Marshall scheduled a meeting with plaintiff for October 20, 2016, during which plaintiff complained about harassment and discrimination. Plaintiff identified the following events as examples:

6

- In August 2016, plaintiff submitted website changes to the IT department for implementation shortly before leaving on vacation. Alexander and Tremblay noted what they believed to be numerous errors and they made revisions to the document in plaintiff's absence because the website was due to go live soon. Upon plaintiff's return to work, Tremblay told plaintiff that he was disappointed in plaintiff's performance and that plaintiff may not be the person for the job. Plaintiff says he ran the changes by Alexander and a task force committee for approval before submitting them and received no comments or feedback. He also says that he would have had time to make the changes after he returned from vacation but before the website went live.

- Plaintiff arrived at 10 a.m. for a 10:30 a.m. "SOAR" presentation that he was scheduled to give. Alexander accused him of being late for the meeting, which started at 9:30 a.m., causing the remaining speakers to give their presentations later than planned. (Defendants maintain that plaintiff was late and did not provide the audience sufficient information.)

- Alexander "falsely accused" plaintif of not completing a flier in a timely or correct manner. Plaintiff felt "attacked" when Tremblay questioned him about the fliers. (The parties dispute exactly what happened with the fliers and who was at fault for the errors and the delay in completing them, but the specific details are not material to plaintiff's claim.)

Plaintiff also told Marshall that there were many changes in his department and he did not know "where he stood." Marshall told plaintiff that what he had reported would not be considered discrimination or harassment and involved performance and communication-related issues. Plaintiff agreed to let Marshall meet with leadership to convey plaintiff's concerns.

### D. Plaintiff Meets with Supervisors to Address Concerns

On October 24, 2016, Tremblay and Marshall met to discuss plaintiff's concerns about his role and responsibilities, but Marshall did not tell Tremblay that plaintiff had complained

7

that Alexander was discriminating against him. Tremblay noted that there were many ongoing changes with which plaintiff appeared to be struggling, particularly as they related to the change in leadership and expectations. Tremblay told Marshall that he was dedicated to the team's success and would look into ways to clarify expectations.

In an email dated October 27, 2016, Tremblay told plaintiff and Alexander that they would be meeting to discuss what roles, responsibilities and duties the director and assistant director should perform. At the November 3, 2016 meeting, plaintiff, Alexander and Tremblay initialed a copy of plaintiff's position description to signify their understanding and agreement. Discussions continued among the three regarding the division of duties, and they agreed to a Educational Success Center "reset." (The parties do not explain what this is but the evidence presented by defendants suggests that it was a chart identifying the roles and responsibilities of the center's director and assistant director.) On December 20, 2016, "Educational Support Services" officially became the "Educational Success Center."

Despite the work that plaintiff and Alexander put into defining their roles, more conflicts developed between them. Some examples of these conflicts were:

- In December 2016, Alexander appointed plaintiff to the management team for Academic Advising, Career Services and Educational Success Center and scheduled a meeting for January 13, 2017. Plaintiff asked one of his staff members to be on the team, Alexander objected and plaintiff argued with Alexander about it. Plaintiff then went to Alexander's supervisor (Tremblay) to argue his position. (Defendants say that plaintiff instructed the employee to take his place and inappropriately delegated his managerial responsibility. Plaintiff says that he did not remove himself from he team but merely added the staff member.)

- On January 19, 2017, Alexander received an automated travel authorization reimbursement request from plaintiff. Plaintiff had not informed her of his

8

> travel plans and had not placed the training on their calendars, as required. Plaintiff sent Alexander an email, explaining his reasons for not following the travel approval process and stating that she could find most of the information she needed on the Travel Authorization form. (Although plaintiff argues that he did nothing wrong, he does not deny that this occurred.)
>
> - On January 24, 2017, Alexander advised plaintiff that he failed to follow the "7-Step protocol" established by Tremblay for staff performance evaluations. Plaintiff responded that "I don't think I have skipped any of the steps."

Tremblay also had a few problems with plaintiff. On January 10, 2017, plaintiff missed the deadline for providing revisions to the Educational Success Center flier, and Tremblay had to perform the edits. (Plaintiff says that Tremblay changed his expectations at the last minute, which did not allow enough time for plaintiff to make the revisions.)

E. Plaintiff's Performance Improvement Plan

Alexander reviewed plaintiff's performance and gathered documentation regarding deficiencies that could be addressed in a performance improvement plan. On February 3, 2017, Tremblay and Alexander placed plaintiff on a three-month performance improvement plan that identified problems and set expectations in the following areas: following departmental protocol, written communication skills, consistent execution of duties, leadership skills, performance evaluation management, accurate representation of the university, following directions, meeting deadlines and general professionalism. Alexander also included handwritten recommendations for improvement in each area. Both Ms. Field, from human resources, and the general counsel for the university system, worked with

9

Alexander and Tremblay on plaintiff's performance improvement plan. (Marshall was not involved in preparing the plan because he had interviewed plaintiff about his discrimination complaint but Marshall had to sign off on the plan as the director of human resources.) Marshall had not disclosed plaintiff's discrimination complaint to anyone involved with the performance plan.

At a meeting on February 3, 2017, plaintiff was notified about the performance improvement plan and provided specific directives to follow to improve his performance by May 3, 2017. Field attended the meeting as a neutral observer. Plaintiff did not sign the performance improvement plan. Instead, on February 6, he submitted a 40-page written response with the intention of modifying the plan or delaying it from taking effect. Although Field, Tremblay and Alexander reviewed plaintiff's response, they decided that the plan should remain in place as written.

After the plan took effect, Alexander met weekly with plaintiff. On March 3, 2017, she gave plaintiff an unsatisfactory performance review, which Tremblay approved. (Plaintiff says that the review was unfounded because he received a positive review from his other supervisor, Hugdahl.) Tremblay also warned plaintiff in a letter dated March 3 that the decision whether to retain plaintiff in his position depended on the outcome of the plan.

After giving Alexander a "notice of retention" for her position on March 6, 2017, Tremblay resigned from the university for personal reasons. Harms was appointed to replace Tremblay. Harms learned about plaintiff's performance improvement plan and attended all of the weekly meetings between plaintiff and Alexander.

On March 24, 2017, Harms held a midpoint progress meeting about the performance plan for which she had instructed Alexander and plaintiff to prepare reports. The meeting notes reflect that Alexander and plaintiff had very different assessments of how the plan was going. Alexander reported continued problems with plaintiff's progress. Rather than prepare a summary of his performance and note areas of improvement and success, plaintiff argued that he should never have been placed on a plan in the first place and that he did not have performance problems. During the meeting, he demanded proof of each instance on which he had missed deadlines, in addition to what Alexander had attached to the report.

On March 27, 2017, the university received notice that plaintiff had filed a discrimination claim with the Equal Employment Opportunity Commission on March 23, 2017, alleging tht he had been placed on the performance improvement plan and issued a negative performance evaluation because of his Asian race.

F. Plaintiff's Non-Retention

In May 2017, Alexander and plaintiff prepared final performance improvement plan reports with divergent assessments of plaintiff's performance under the plan. On May 31, 2017, Harms reviewed plaintiff's performance under the plan and prepared a detailed memorandum explaining how plaintiff failed to satisfy each of the directives outlined in the plan. (Defendants set forth all of the deficiencies identified by Harms, and plaintiff says that they are all false or inaccurate.) Harms made a final recommendation that plaintiff not be retained for performance reasons, noting that

11

> While Thao has met expectations on a few limited elements of this Performance Improvement Plan they are the areas that hold the least importance in the bigger picture of the performance of a leader within a department. Being able to lead, coordinate, direct, and supervise initiatives and staff is more vital than emailing a supervisor about vacation time. Thao's inability to identify and prioritize completion of critical, leadership level tasks is disturbing and the level of supervision that has been provided to him in the last six months and on every area of this plan cannot continue. Retention of Toua Thao as an employee of UW Superior is not recommended and movement toward notification of such should take place.

Alexander did not make the final decision regarding non-retention.

In a letter dated June 5, 2017, Marshall informed plaintiff of the non-retention decision and provided him a six-month notice in accordance with university policy. Plaintiff's final date of employment was to be December 5, 2017.

Plaintiff filed a claim on July 18, 2017, alleging that he had not been retained in retaliation for filing the March 23, 2017 discrimination claim.

### G. Plaintiff's Administrative Leave

On November 13, 2017, Alexander notified human resources of a possible issue regarding plaintiff's use of sick leave on October 23, 2017, when he was interviewing for employment with the University of Wisconsin–Stevens Point. The next day, Marshall told plaintiff that it had come to his attention that plaintiff may have abused the sick leave privilege on October 23, 2017 and needed to provide a written certification from a health care provider. Plaintiff said that he had been sick that day but did not see a health care provider. On November 16, 2017, Marshall determined that plaintiff should be placed on paid administrative leave while an investigation was conducted. He assigned the investigation

to Lauren Howard in human resources. Howard's investigation found the preponderance of the evidence demonstrated that plaintiff had misused sick leave policy. No action was taken and plaintiff did not receive any discipline or lose any pay because Howard completed her investigation after plaintiff's last day of employment on December 5, 2017.

OPINION

A. Legal Standards

Plaintiff contends that defendants placed him on a performance improvement plan and failed to retain him as an employee because of his race, national origin and complaints about discrimination. Title VII prohibits employers from discriminating against an employee with respect to his compensation, terms, conditions or privileges of employment based on race or national origin, 42 U.S.C. § 2000e–2(a)(1), and prohibits retaliation or discrimination against an employee "because he has opposed any practice made an unlawful practice by this subchapter," 42 U.S.C. § 2000e–3(a). Section 1981 prohibits racial discrimination and retaliation against employees when a contractual relationship exists between the employer and employee. Thompson v. Memorial Hospital of Carbondale, 625 F.3d 394, 402-03 (7th Cir. 2010); Hobbs v. City of Chicago, 573 F.3d 454, 460 (7th Cir. 2009). "[Al]though the statutes differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical." Davis v. Time Warner Cable of Southeastern Wisconsin, L.P., 651 F.3d 664, 671-72 (7th Cir. 2011) (quoting McGowan v. Deere & Co., 581 F.3d 575, 579 (7th Cir. 2009)).

Plaintiff may satisfy these standards by introducing direct or circumstantial evidence that defendant failed to hire him because of his race, national origin or complaint of discrimination. Skiba v. Illinois Central Railroad Co., 884 F.3d 708, 719 (7th Cir. 2018). Direct admissions of bias are rare and do not exist in this case. Circumstantial evidence might include: (1) suspicious timing, ambiguous oral or written statements, or behavior toward, or comments directed at, other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; or (3) evidence that the employer offered a pretextual reason for an adverse employment action. Tank v. T-Mobile USA, Inc., 758 F.3d 800, 805 (7th Cir. 2014); Murphy v. Board of Regents of University of Wisconsin System, 73 F. Supp. 3d 1042, 1047-48 (W.D. Wis. 2014). Plaintiff's arguments that defendants inaccurately assessed his performance fall into the third category.

In addition, a plaintiff may proceed through the burden-shifting framework adapted from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the burden-shifting approach, plaintiff must come forward with evidence showing that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) his employer treated at least one similarly situated employee not in plaintiff's protected class more favorably. Cung Hnin v. TOA (USA), LLC, 751 F.3d 499, 504 (7th Cir. 2014). Plaintiff's race (Asian) and national origin (Hmong) qualify him as a member of a protected class and both his internal and formal complaints of discrimination may be considered protected activities. Although the parties seem to agree

that plaintiff suffered an adverse employment action, they dispute whether plaintiff was meeting defendants' expectations and whether Alexander qualifies as a similarly situated employee for purposes of the analysis.

If plaintiff establishes a prima facie case with respect to either his race, national origin or protected activity, the burden shifts "to the defendant[s] to 'articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual,'" that is, it was not the true reason for the adverse employment action. Carson v. Lake County, Indiana, 865 F.3d 526, 533 (7th Cir. 2017). "Pretext requires more than showing that the decision was mistaken, ill considered or foolish, [and] so long as [the employer] honestly believed those reasons, pretext has not been shown." Farrell v. Butler University, 421 F.3d 609, 613 (7th Cir. 2005). Usually, a "court should first determine if a plaintiff has established a prima facie case before subjecting the employer to the pretext inquiry." Hague v. Thompson Distribution Co., 436 F.3d 816, 823 (7th Cir. 2006). However, in cases in which "an employer has cited performance issues as the justification for its adverse action, the performance element of the prima facie case cannot be separated from" the pretext inquiry. Duncan v. Fleetwood Motor Homes of Indiana, Inc., 518 F.3d 486, 491 (7th Cir. 2008) (per curiam).

Under either the direct or burden-shifting method, "at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action because of" his race, national origin or protected

15

activity. Carson, 865 F.3d at 533 (citing Ortiz v. Werner Enterprises, Inc., 834 F.3d 760 (7th Cir. 2016)) ("Th[e] legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [race, national origin or protected conduct] caused the [] adverse employment action. Evidence must be considered as a whole. . . ."). For the reasons discussed below, I find that plaintiff has failed to meet this standard.

### B. Plaintiff's Evidence

Defendants contend that Alexander and Tremblay identified several problems with plaintiff's performance that led to the issuance of the performance improvement plan in February 2017, and that plaintiff was terminated because he failed to correct those deficiencies and show any improvement. Specifically, Harms concluded that plaintiff's "inability to identify and prioritize completion of critical, leadership level tasks is disturbing and the level of supervision that has been provided to him in the last six months and on every area of this plan cannot continue" and that retention of plaintiff as an employee was "not recommended and movement toward notification of such should take place."

Plaintiff's sole argument in support of his claims is that Alexander's and Tremblay's initial assessment of his performance and Harms's later analysis of his progress with respect to the performance improvement plan were false and unfounded. Although plaintiff contends that his supervisors criticized his performance because he is Asian and Hmong and later complained about discrimination, he has not offered any evidence in support of his contentions apart from his own opinion. Jordan v. City of Gary, 396 F.3d 825, 832 (7th Cir.

16

2005) (stating that circumstantial evidence "must point directly to a discriminatory reason for the employer's action"); Prochaska v. Menard, Inc., 829 F. Supp. 2d 710, 713 (W.D. Wis. 2011) ("[I]n the context of a motion for summary judgment, the parties must provide specific facts to support their positions, not conclusory allegations."). To show that an employer's reason for an adverse employment action is pretextual, plaintiff "must present evidence suggesting that the employer is dissembling." O'Leary v. Accretive Health, Inc., 657 F.3d 625, 635 (7th Cir. 2011). "To meet this burden, [plaintiff] must 'identify such weaknesses, implausibilities, inconsistencies, or contradictions' in [defendant's] asserted reason 'that a reasonable person could find [it] unworthy of credence.'" Id. (citations omitted).

Although plaintiff clearly disagrees with his supervisors' conclusions, the court's role is to prevent unlawful employment practices and not act as a "super personnel department" that second-guesses an employer's business judgments. Millbrook v. IBP, Inc., 280 F.3d 1169, 1181 (7th Cir. 2002). As discussed, plaintiff must show that his employer is lying about why it is taking the adverse employment action, not merely that his employer is wrong. Kulumani v. Blue Cross Blue Shield Association., 224 F.3d 681, 685 (7th Cir. 2000); Jordan v. Summers, 205 F.3d 337, 343 (7th Cir. 2000). By and large, plaintiff does not dispute that he missed meetings or deadlines and made what Alexander and Tremblay considered to be errors in certain documents. What plaintiff primarily wants to challenge is how his supervisors perceived and characterized those events, and whether they should have accepted his explanations for each of them. However, these are the types of internal business and personnel decisions which federal courts do not second guess, absent some evidence that the

17

employer's decision was "completely unreasonable." Hobgood v. Illinois Gaming Board, 731 F.3d 635, 646 (7th Cir. 2013). See also Burton v. Board of Regents of the Univ. of Wisconsin Sys., 171 F. Supp. 3d 830, 846 (W.D. Wis. 2016), aff'd, 851 F.3d 690 (7th Cir. 2017) (citing same). There is nothing about the behavior or actions of Alexander, Tremblay or Harms that suggests that they were lying about plaintiff's not meeting his employment expectations, or that plaintiff's race, national origin or protected activity factored into their decisions regarding plaintiff's performance or continued employment.

Plaintiff attempts to argue that Alexander, who is Caucasian, made some similar mistakes—such as missing meetings or making documents with typographical errors—and was not disciplined for them, but plaintiff has not shown that Alexander is a similarly-situated employee. Alexander was a director and supervised plaintiff. Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002) (noting it is "next to impossible for a court to conclude that a subordinate is similarly situated" to a supervisor, given the latter's different experience, qualifications and job responsibilities); Milloy v. WBBM-TV, Chicago, 613 F. Supp. 2d 1035, 1037 (N.D. Ill. 2009) (differences in status, such as managerial versus non-managerial employees, negate similarly situated test); Connolly v. Ala Carte Entertainment, Inc., 2002 WL 31248497, at *5 (N.D. Ill. Oct. 7, 2002) ("Supervisors and superiors are not similarly situated to subordinates."). She did not hold the same job description as plaintiff, was not subordinate to the same supervisor as plaintiff and appeared to be subject to different standards and to have had different experience, education and other qualifications from

plaintiff.  Bisluk v. Hamer, 800 F.3d 928, 935 (7th Cir. 2015) (identifying these as factors to consider in similarly-situated analysis).

Additionally, it is undisputed that none of the decision makers knew about plaintiff's complaint to the human resources department, and plaintiff has failed to adduce any facts showing that they knew about the complaint he filed with the Equal Employment Opportunity Commission.  In any event, without more, suspicious timing between a protected activity and an adverse employment action alone rarely establishes the causation necessary to prove a retaliation claim.  Sklyarsky v. Means-Knaus Partners, L.P., 777 F.3d 892, 898 (7th Cir. 2015).

In sum, plaintiff's evidence is not sufficient to create a genuine dispute of material fact as to the reasons defendants placed him on a performance improvement plan or decided not to retain him.  Therefore, plaintiff has failed to provide a basis for finding intentional discrimination or retaliation.

ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Board of Regents of the University of Wisconsin System and University of Wisconsin Superior, dkt.

#14, is GRANTED. The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 20th day of November, 2018.

BY THE COURT:

/s/
_____
BARBARA B. CRABB
District Judge